UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                                      )
UNITED STATES OF AMERICA              )
                                      )
        v.                            )   CRIMINAL ACTION
                                      )   NO. 04-10372-WGY
GEORGE KANDIRAKIS,                    )
        Defendant.                    )
                                      )
```

#### SENTENCING MEMORANDUM

YOUNG, D.J.                                          August 1, 2006

> **"What is overlooked in post-Booker discussions is the
> fact that, for seventeen years, federal courts had been
> sentencing offenders unconstitutionally."[1]**

For seventeen years federal courts had been sentencing

offenders unconstitutionally.  Think about that.  The human cost

is incalculable -- thousands of Americans languish in prison

under sentences that today are unconstitutional.  The

institutional costs are equally enormous -- for seventeen years

the American jury was disparaged and disregarded in derogation of

its constitutional function; a generation of federal trial judges

has lost track of certain core values of an independent judiciary

because they have been brought up in a sentencing system that

strips the words "burden of proof", "evidence", and "facts" of

---

[1] Professor Douglas Berman, Remarks at Harvard Black Letter
Law Association (Apr. 4, 2006).

genuine meaning[2]; and the vulnerability of our fair and impartial

federal trial court system to attack from the political branches

of our government has been exposed as never before in our

history.[3]

Today, elements in the legislature, a monolithic executive,

and courts below the Supreme Court all seem to be acting in

concert to devise a sentencing system as close to

unconstitutionality as possible.[4]   This Court has charted a

---

[2]See United States v. Green, 346 F. Supp. 2d 259, 280-82 (D.
Mass. 2004), rev'd 426 F.3d 64 (1st Cir. 2005); and rev'd sub
nom. United States v. Pacheco, 434 F.3d 106 (1st Cir. 2006);
United States v. Yeje-Cabrera, 430 F.3d 1 (1st Cir. 2005).

[3]See, e.g., United States v. Kirsch, 287 F. Supp. 2d 1005,
1006-07 (D. Minn. 2003) (Magnuson, J.) ("Congress and the
Attorney General have instituted policies designed to intimidate
and threaten judges into refusing to depart downward, and those
policies are working.  If the Court were to depart, the Assistant
U.S. Attorney would be required to report that departure to the
U.S. Attorney, who would in turn be required to report to the
Attorney General.  The Attorney General would then report the
departure to Congress, and Congress could call the undersigned to
testify and attempt to justify the departure.  This reporting
requirement system accomplishes its goal: the Court is
intimidated, and the Court is scared to depart.").

[4]See United States v. Navedo-Concepti&oacute;n, 450 F.3d 54, 60
(1st Cir. 2006) (Torruella, J., dissenting) ("I am concerned that
we are, like a glacier in the ice age, inch by slow inch,
regressing to the same sentencing posture we assumed before the
Supreme Court decided Booker.  . . .  [I do not] believe that
this is what the Supreme Court had in mind when it struck down
the mandatory Guidelines regime."); Judge Nancy Gertner, What
Yogi Berra Teaches about Post-Booker Sentencing, Yale L.J. (The
Pocket Part), July 2006, http://www.thepocketpart.org/2006/07/
gertner.html ("[W]ith each decision and report, the slide towards
'mandatoriness' has resumed.  The courts and the [Sentencing]
Commission are each walking the same path post-Booker as they had
pre-Booker.  . . .  [L]ock step 'compliance' with Guidelines
while intoning 'advisoriness'[] is not just bad policy or worse,

2

different course -- one that gives real meaning to the language of all the controlling decisions of the Supreme Court, yet scrupulously adheres to the rulings of that inferior court which controls the work of this one. It is a procedure that ensures significant protections for all litigants without added burden, wasted time, or cost to our system of justice.

This Sentencing Memorandum maps the legal landscape and explains the Court's procedures within it -- all in the context of a well-tried case which required this Court to work through the implications of its own practices.

## I. The Prosecution -- Opening Moves

On December 15, 2004, a federal grand jury indicted Jess Siciliano ("Siciliano"), Michael Arco ("Arco"), and George Kandirakis ("Kandirakis") for conspiracy and possession, with intent to distribute, oxycodone -- known commonly by one of its trade names, OxyContin. The government charged that Siciliano was an OxyContin supplier and that Arco and Kandirakis were OxyContin retailers who got their illicit supplies from Siciliano. The government conceded that Kandirakis was the least

hypocrisy; this time it will be unconstitutional."); see also Letter from Jon M. Sands, Federal Public Defender, to Hon. Ricardo Hinojosa, Chair, U.S. Sentencing Commission (July 19, 2006), Memorandum at 1 ("The Commission should not continue to recommend minimal constitutional protections."), available at http://sentencing.typepad.com/sentencing_law_and_policy/files/defender_letter_to_ussc_71906.pdf.

involved of the three. Siciliano and Arco quickly copped pleas. The plea deals, proffered to the Court pursuant to Federal Rule of Criminal Procedure 11(c)(1)(C)[5], would result in a 46-month sentence for Siciliano and a 57-month sentence for Arco.[6]

---

[5]A Rule 11(c)(1)(C) plea bargain crowds a judge into a "take it or leave it" position. It facilitates plea bargaining -- today, the functional goal of our criminal justice system, see George Fisher, Plea Bargaining's Triumph, 109 Yale L.J. 857 (2000) -- by requiring a judge to "give back" a plea if she imposes other than the sentence bargained for.

This, of course, adds a powerful, near-hydraulic pressure in favor of plea bargaining. While it theoretically still guards against extreme, sweetheart deals and monstrously draconian agreements, such safeguards are practically nil. In twenty-one years of service as a district judge, I have never refused such a plea once proffered. (I can make this statement with confidence since Donald Womack, the superb official court reporter assigned to this session, see Miara v. First Allmerica Fin. Life Ins. Co., 379 F. Supp. 2d 20, 69 n.57 (D. Mass. 2005), has provided to the Court and to the public a fully searchable database of all this Court's sentencing decisions at http://donwomack.com. See infra note 76.)

The reasons for the parties seeking to cabin judicial discretion are not hard to fathom. I have a deserved reputation for sentencing severely. See, e.g., United States v. Berthoff, 140 F. Supp. 2d 50, 55 (D. Mass. 2001) (sentencing at the top of the Guidelines range). At least, I did under the unconstitutional "mandatory Guidelines" system. Siciliano and Arco wished to avoid the risk of a sentence heavier than they could bargain. Ever the superb institutional litigant, however, the government as a repeat player, sensed (it probably keeps its own records) that in the present "advisory Guidelines" system, I am more likely than any of my colleagues in the District of Massachusetts to sentence below the advisory range (but not by much). U.S. Sentencing Commission, "Federal Sentencing Statistical Report Prepared for the Hon. Mark L. Wolf, Chief Judge" (2006) (providing individual district court judge and circuit court statistics on length of sentences imposed and Guidelines departure comparisons). The government naturally wished to force a sentence as severe as it could bargain.

[6]The longer proposed sentence for the retailer Arco as compared with the supplier Siciliano is explained by Arco's lengthier criminal history.

The Court held an extensive plea colloquy with Siciliano and Arco, explaining the procedural protections it affords defendants who go to trial. See infra Part IV. From this colloquy, the Court concluded that both Siciliano and Arco had bargained down, for sentencing purposes, the quantity of OxyContin properly attributable to them, the government trading away provable facts in return for the certainty that comes from a plea.[7] The First Circuit explicitly embraces such "fact bargaining", even when relevant data is hidden from the Court. See United States v. Yeje-Cabrera, 430 F.3d 1, 23-30 (1st Cir. 2005). While this is the ugly truth on which many plea-bargained sentences rest, so sweeping is our plea bargaining culture today, that it is a staple of criminal practice in this circuit and district.[8] Those who deny it[9] are sophists, engaging in what my colleague, Judge

---

[7]In fairness to the government, it must be noted that during Kandirakis's sentencing hearing, the Court revised its view as to Arco, concluding that, in his case, the sentence imposed actually encompasses his relevant conduct.

[8]See, e.g., Yeje-Cabrera, 430 F.3d at 23-30; United States v. Thurston, 358 F.3d 51 (1st Cir. 2004); United States v. Rodriguez, 162 F.3d 135 (1st Cir. 1998); United States v. Bleidt, No. 05-10144 (D. Mass filed June 5, 2005), Plea Hr'g, Dec. 5, 2005 (aged and vulnerable nature of many victims omitted to secure plea); United States v. Fuller, No. 05-10082 (D. Mass. filed Mar. 24, 2005), Plea and Sentencing Hr'g, Nov. 16, 2005 (fraud loss amount understated to secure plea); United States v. Montilla, No. 04-10160 (D. Mass. filed May 20, 2004), Sentencing Hr'g, Oct. 18, 2005 (drug quantity understated to secure plea).

[9]See Amie N. Ely, Note, Prosecutorial Discretion as an Ethical Necessity: The Ashcroft Memorandum's Curtailment of the Prosecutor's Duty to "Seek Justice", 90 Cornell L. Rev. 237, 252-59 (2005) (describing the Department of Justice's purported

Douglas Woodlock, calls "a massive exercise in hypocrisy".
Berthoff, 140 F. Supp. 2d at 64.

Fearing the vindictive moral quagmire that the government
creates when it posits a more favorable, alternative factual
universe for those who will plead guilty, but then proves the
actual facts against those who go to trial, this Court
entertained Siciliano's and Arco's proffered pleas, but declined
to accept or reject them until Kandirakis had been tried and, if
necessary, sentenced.[10]

This done, the government and Kandirakis, gearing up for
trial, "set [their] faces to the stormy sea [and] bid the land
farewell."[11]

---

charging and sentencing policies).

[10]It is clear that the First Circuit sees no vindictiveness
where the government is willing to hide facts from the Court if
there is to be a plea, but goes ahead and proves those facts if
the plea deal falls through and the defendant goes to trial.
Yeje-Cabrera, 430 F.3d at 23-30. Such analysis binds this Court.
What remains unclear is whether that court discerns
vindictiveness when one defendant gets the advantage of an
imaginary universe of facts, and another, similarly situated
defendant does not. But see United States v. Thurston, No. 05-
2271, -- F.3d --, 2006 WL 2065404, at *4-5 (1st Cir. July 26,
2006) (mandating a lengthy prison sentence for one defendant who
went to trial, but probation for a co-defendant who pled;
defendants were not similarly situated because one of them went
to trial; yet this rule does not "impose a burden on [the
defendant's] exercise of his constitutional right to a jury
trial").

[11]Tommy Makem, "Ballad of the Lady Jane", on Lonesome Waters
(Shanachie Records 1986).

6

A necessary part of that preparation, for both the Court and counsel, involved significant legal analysis.

## II.   A "Muddled"[12] Legal Landscape: The Two Faces of Booker

Eighteen months ago the Supreme Court issued its decision in United States v. Booker. 543 U.S. 220 (2005).  The case had promised to be the culmination of a reinvigoration in the criminal defendant's Sixth Amendment right to trial by jury, which the Court had begun several years before in Apprendi v. New Jersey.  530 U.S. 466 (2000).[13]  In Apprendi, the Court held that, "[o]ther than the fact of a prior conviction[14], any fact

___

[12]Douglas A. Berman, Perspectives and Principles for the Post-Booker World, 17 Fed. Sentencing Rep. 231, 231 (2005) ("[T]he Booker decision made a conceptually muddled constitutional jurisprudence of sentencing even more opaque.").

[13]The Court's decision in Apprendi had been foreshadowed the previous term in Jones v. United States, 526 U.S. 227 (1999), which construed a federal statute so as to avoid the constitutional question.

[14]This caveat was the remnant of the Court's decision in Almendarez-Torres v. United States.  523 U.S. 224 (1998).  The five-Justice majority included Justice Thomas, who all but recanted his support for that decision in Apprendi.  See 530 U.S. at 518-23 (Thomas, J., concurring).  Since Apprendi, Justice Thomas has made only clearer his dissatisfaction with his vote in Almendarez-Torres.  See Rangel-Reyes v. United States, 126 S. Ct. 2873, 2874-75 (2006) (Thomas, J, dissenting from denial of certiorari); Shepard v. United States, 544 U.S. 13, 27-28 (2005) (Thomas, J., concurring) ("Almendarez-Torres . . . has been eroded by this Court's subsequent Sixth Amendment jurisprudence, and a majority of the Court now recognizes that [it] was wrongly decided.  The parties do not request it here, but in an appropriate case, this Court should consider Almendarez-Torres'[s] continuing viability.  Innumerable criminal defendants have been unconstitutionally sentenced under the flawed rule . .

7

that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt."  Id. at 490.[15]

The consequences of Apprendi for the Federal Sentencing Guidelines were immediately apparent.  See id. at 550-51 (O'Connor, J., dissenting).  Though the facts of Apprendi involved legislatively enacted statutes, the constitutional rule of that case seemed equally to apply to all judge-based, determinate sentencing schemes.  This Court so held on June 18, 2004, in United States v. Green, 356 F. Supp. 2d 259 (D. Mass. 2004), which ruled the Guidelines unconstitutional.  Green's reasoning was confirmed days later in Blakely v. Washington, 542 U.S. 296 (2004), which invalidated the State of Washington's nearly identical sentencing apparatus.  Though the Supreme Court officially reserved the question, id. at 305 n.9, after Blakely it was quite obvious to many other observers that the Guidelines were unconstitutional.  As soon as "the [Supreme] Court could get

_____

. ." (citations omitted)).  The issue not having been revisited by the Court, however, it is still "good law".  See Booker, 543 U.S. at 244.

But see Rangel-Reyes, 126 S. Ct. at 2873 (Stevens, J.) ("While I continue to believe that Amendarez-Torres v. United States, 523 U.S. 224 (1998), was wrongly decided, that is not sufficient reason for revisiting the issue.").

[15]Apprendi is fast becoming one of the most-cited Supreme Court cases ever.  See Adam N. Steinman, The Irrepressible Myth of Cylotex: Reconsidering Summary Judgment Burdens Twenty Years after the Trilogy, 63 Wash. & Lee L. Rev. 81, 144-45 (2006) (showing Apprendi as the 24th most-cited case by all courts, despite being only 6 years old).

before it a case properly presenting the constitutionality of the
mandatory [federal] Guidelines", they likewise were invalidated.
Booker, 543 U.S. at 313 (Scalia, J., dissenting in part).

Booker could have been the simple, logical extension of the
Supreme Court's Apprendi jurisprudence. Instead, the Court
produced a fractured, 124-page decision with two majority
opinions and four dissents. What remained after the verbal
cannonades was this:

- One majority opinion ("Constitutional Booker") which
  ruled that the Guidelines violated the Sixth Amendment.
  This opinion was written by Justice Stevens and joined
  by Justices Scalia, Souter, Thomas, and Ginsburg.

- Another majority opinion ("Remedial Booker") which
  ruled that the way to rectify the constitutional
  infirmity was to make the Guidelines advisory rather
  than mandatory. This opinion was written by Justice
  Breyer and joined by Chief Justice Rehnquist and
  Justices O'Connor, Kennedy, and Ginsburg.

How logically to implement these two majority opinions has been a
question with which the lower federal courts have been grappling
ever since.

## A.  Constitutional Booker

The constitutional decision in Booker is quite succinct.  A
review of the Court's Sixth Amendment jurisprudence -- especially
its Blakely decision -- yielded but one conclusion: "[T]here is
no distinction of constitutional significance between the Federal
Sentencing Guidelines and the Washington procedures at issue in

9

that case."  Booker, 543 U.S. at 233.  As quoted above, the rule
set forth in Apprendi is that, "[o]ther than the fact of a prior
conviction, any fact that increases the penalty for a crime
beyond the prescribed statutory maximum must be submitted to a
jury, and proved beyond a reasonable doubt."  530 U.S. at 490.
As further explicated in Blakely, "the relevant 'statutory
maximum' is not the maximum sentence a judge may impose after
finding additional facts, but the maximum he may impose without
any additional findings."  542 U.S. at 303-04.

     The mandatory nature of the Guidelines was crucial.  "If the
Guidelines as currently written could be read as merely advisory
provisions that recommended, rather than required, the selection
of particular sentences in response to differing sets of facts,
their use would not implicate the Sixth Amendment.  . . .
Indeed, everyone agrees that the constitutional issues presented
by these cases would have been avoided entirely if Congress had
omitted from the [Sentencing Reform Act of 1984] the provisions
that make the Guidelines binding on district judges . . . ."
Booker, 543 U.S. at 233.  Therefore, after rejecting stare
decisis and separation of powers arguments, the Court "reaffirmed
[its] holding in Apprendi" and declared the Guidelines
unconstitutional.  Id. at 239-43, 244.

10

**B.    Remedial Booker**

The second majority seized on the mandatory nature of the
Guidelines in remedying their unconstitutionality.   Booker, 543
U.S. at 244-71.  Consequently, rather than grafting the Sixth
Amendment's jury right onto the Guidelines (the solution
preferred by the Justices of Constitutional Booker, minus Justice
Ginsburg) or discarding the Guidelines altogether (a solution no
Justice supported), Remedial Booker papered over the Guidelines'
Sixth Amendment infirmity by "sever[ing] and excis[ing]" two
sections of Title 18 that made the Guidelines mandatory for
sentencing[16] and

---

[16]Title 18, Section 3553 provides in relevant part:

(a) Factors to be considered in imposing sentence.--
The court shall impose a sentence sufficient, but not
greater than necessary, to comply with the purposes set
forth in paragraph (2) of this subsection.  The court,
in determining the particular sentence to be imposed,
shall consider--
>    (1) the nature and circumstances of the offense
>    and the history and characteristics of the
>    defendant;
>    (2) the need for the sentence imposed--
>>        (A) to reflect the seriousness of the
>>        offense, to promote respect for the law, and
>>        to provide just punishment for the offense;
>>        (B) to afford adequate deterrence to criminal
>>        conduct;
>>        (C) to protect the public from further crimes
>>        of the defendant; and
>>        (D) to provide the defendant with needed
>>        educational or vocational training, medical
>>        care, or other correctional treatment in the
>>        most effective manner;
>    (3) the kinds of sentences available;
>    (4) the kinds of sentence and the sentencing range
>    established for--

11

appellate[17] courts.  Id. at 245, 249.  Doing so made the

> (A) the applicable category of offense
> committed by the applicable category of
> defendants as set forth in the guidelines
> issued by the Sentencing Commission pursuant
> to section 994(A)(1) of title 28, United
> States Code, and that are in effect on the
> date the defendant is sentenced; . . .
>
> (5) any pertinent policy statement issued by the
> Sentencing Commission pursuant to section
> 994(a)(2) that is in effect on the date the
> defendant is sentenced;
>
> (6) the need to avoid unwarranted sentence
> disparities among defendants with similar records
> who have been found guilty of similar conduct; and
> (7) the need to provide restitution to any victims
> of the offense.

(b) Application of guidelines in imposing a sentence.--
  (1) In general. Except as provided in paragraph (2),
  the court shall impose a sentence of the kind, and
  within the range, referred to in subsection (a)(4)
  unless the court finds that there exists an aggravating
  or mitigating circumstance of a kind, or to a degree,
  not adequately taken into consideration by the
  Sentencing Commission in formulating the guidelines
  that should result in a sentence different from that
  described.  . . . .

[17]Title 18, Section 3742(e) provides:

Consideration.-- Upon review of the record, the court
of appeals shall determine whether the sentence--
  (1) was imposed in violation of the law;
  (2) was imposed as a result of an incorrect
  application of the sentencing guidelines;
  (3) is outside the applicable guideline range, and
    (A) the district court failed to provide the
    written statement of reasons required by
    section 3553(c);
    (B) the sentence departs from the applicable
    guideline range based on a factor that--
      (i) does not advance the objectives set
      forth in section 3553(a)(2); or
      (ii) is not authorized under section
      3553(b); or
      (iii) is not justified by the facts of
      the case; or

Guidelines "effectively advisory". Id. at 245.

Section 3553(b)(1) of the U.S. Code required the district court to impose a sentence "of the kind[] and within the range" set forth in the Guidelines. Striking this Section, the Court ruled that what remained still "requires judges to take account of the Guidelines together with other sentencing goals." Id. at 259 (citing 18 U.S.C. § 3553(a)). Thus, "[t]he district courts, while not bound by the Guidelines, must consult those Guidelines and take them into account when sentencing." Id. at 264. "It requires a sentencing court to consider the Guidelines ranges, but it permits the court to tailor the sentence in light of other statutory concerns as well." Id. at 245-46 (citations omitted).

_____

> (C) the sentence departs to an unreasonable
> degree from the applicable guidelines range,
> having regard for the factors to be
> considered in imposing a sentence, as set
> forth in section 3553(a) of this title and
> the reasons for the imposition of the
> particular sentence, as stated by the
> district court pursuant to the provisions of
> section 3553(c); or
>
> (4) was imposed for an offense for which there is
> no applicable sentencing guideline and is plainly
> unreasonable.
> The court of appeals shall give due regard to the
> opportunity of the district court to judge the
> credibility of the witnesses, and shall accept the
> findings of fact of the district court unless they are
> clearly erroneous and, except with respect to
> determinations under subsection (3)(A) or (3)(B), shall
> give due deference to the district court's application
> of the guidelines to the facts. With respect to
> determinations under subsection (3)(A) or (3)(B), the
> court of appeals shall review de novo the district
> court's application of the guidelines to the facts.

13

Further, the Court struck Section 3742(e). Id. at 260-67. That Section had given the Circuit Courts of Appeals de novo review of sentences falling outside the prescribed Guidelines range. See 18 U.S.C. § 3742(e)(3)(B)(ii). In its place, the Court established a standard of "reasonableness". Stating that the appellate courts were "already familiar" with the standard from "the past two decades of appellate practice in cases involving departures", the Court said that circuit courts should look to the factors set forth in Section 3553(a) to guide them, "as they have in the past". Booker, 543 U.S. at 261. Disclaiming Justice Scalia's "belief that use of a reasonableness standard '[would] produce a discordant symphony' leading to 'excessive sentencing disparities,' and 'wreak havoc' on the judicial system", the Remedial Booker majority concluded that, as the Sentencing Commission "continue[s] to modify its Guidelines", it would "encourag[e] wha: it finds to be better sentencing practices." Id. at 263. This tack would "thereby promote uniformity in the sentencing process", id., and allow circuit courts to "iron out sentencing differences", id. at 263.

14

## C.   Contradictions

### "The Federal Sentencing Guidelines are dead.
### Long live the Federal Sentencing Guidelines."[18]

As Judge Michael W. McConnell of the Tenth Circuit has
noted, the two Booker opinions, "taken in tandem, do not get high
marks for consistency or coherence. . . . The most striking
feature of the Booker decision is that the remedy bears no
logical relation to the constitutional violation."   Michael W.
McConnell, The Booker Mess, 83 Denver U. L. Rev. 665, 677
(2006).[19]  The constitutional violation of the Guidelines was
that judges, rather than juries, found the facts necessary for
sentencing.   Instead of focusing the remedy on who performed the
fact-finding, however, Remedial Booker honed in on the
"necessity" of the facts.   It purported to make those facts
"unnecessary" by making the Guidelines "effectively advisory".
As a result, "[t]he jury verdict is no more consequential after

---

[18]Edward Lazarus, "The Supreme Court's Sentencing Guidelines
Decision: Its Logic, and Its Surprisingly Limited Practical
Effect", Jan. 21, 2005, at http://writ.news.findlaw.com/lazarus/
20050121.html.

[19]See also United States v. Cage, 451 F.3d 585, 591-94 (10th
Cir. 2006); Frank O. Bowman, Beyond Band-Aids: A Proposal for
Reconfiguring Federal Sentencing After Booker, 2005 U. Chi. Legal
F. 149, 182 ("[One] mystery about the Booker remedial opinion is
how it can possibly be squared with either the announced black-
letter rule or the underlying theory of the Blakely opinion it
purports to apply."); David J. D'Addio, Sentencing After Booker:
The Impact of Appellate Review on Defendants' Rights, 24 Yale L.
& Pol'y Rev. 173, 174 (2006) ("How these two majority opinions
fit together remains a puzzle, in part because of an inherent
contradiction in Justice Breyer's remedial opinion.").

Booker than it was before". McConnell, supra, at 677. "All the things that troubled Sixth Amendment purists about the pre-Booker Guidelines system are unchanged", including reliance on uncharged and even acquitted conduct. Id.; see Booker, 543 U.S. at 302 (Stevens, J., dissenting in part) ("[T]he Court [in Remedial Booker] has effectively eliminated the very constitutional right Apprendi sought to vindicate.").

The way in which most circuit courts have decided to review the countless criminal sentences issued under the pre-Booker, mandatory Guidelines system illustrates this contradiction well. The First Circuit[20] confronted the question in United States v. Antonakopoulos. 399 F.3d 68 (1st Cir. 2005). The court first framed the issue: "The [Booker] error is not that a judge (by a preponderance of the evidence) determined facts under the Guidelines which increased a sentence beyond that authorized by the jury verdict or an admission by the defendant; the error is only that the judge did so in a mandatory Guidelines system." Id. at 75. Formulating the error this way brings the contradiction of Booker into stark relief: Reading the Apprendi line of cases -- including Constitutional Booker -- one naively might have thought judicial fact-finding was precisely the constitutional error. Because Remedial Booker allowed the

_____

[20]For obvious reasons, this Sentencing Memorandum will focus primarily on First Circuit decisions. Not much of what will be said is unique to the decisions of that court, though. Where relevant, decisions from other circuit courts will be noted.

16

Guidelines' unconstitutionality to be remedied by concocting an advisory system, however, it is hard to find fault with the ruling in Antonakopoulos.

This premise then led the First Circuit to conclude that for a defendant to receive the benefits of Booker, he must "point to circumstances creating a reasonable probability that the district court would impose a different sentence more favorable to [him] under the new 'advisory Guidelines' Booker regime." Id. The court said that "this is a necessary consequence of our view of the nature of the Booker error." Id. at 79. The First Circuit is not alone. See United States v. Liner, 435 F.3d 920 (8th Cir. 2005); United States v. Graham, 413 F.3d 1211 (10th Cir. 2005); United States v. Ameline, 409 F.3d 1073 (9th Cir. 2005); United States v. Mares, 402 F.3d 511 (5th Cir. 2005); United States v. Lee, 399 F.3d 864 (7th Cir. 2005); United States v. Rodriguez, 398 F.3d 1291 (11th Cir. 2005); see also United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).²¹ The obvious disconnect between

²¹But see United States v. Oliver, 397 F.3d 369, 377-81 (6th Cir. 2005) ("A sentencing error that leads to a violation of the Sixth Amendment by imposing a more severe sentence than is supported by the jury verdict would diminish the integrity and public reputation of the judicial system and also would diminish the fairness of the criminal sentencing system." (internal quotation marks omitted)); United States v. Davis, 397 F.3d 173 (3d Cir. 2005); United States v. Hughes, 396 F.3d 374, 379-81 (4th Cir. 2005) ("[T]o leave standing this sentence imposed under the mandatory guideline regime, we have no doubt, is to place in jeopardy the fairness, integrity or public reputation of judicial proceedings." (footnote and internal quotation marks omitted)); see also United States v. Williams, 399 F.3d 450, 459 (2d Cir. 2005) (following contrary circuit precedent, but stating that the

17

these decisions and the principle of Constitutional <u>Booker</u> was the earliest tangible indication that <u>Booker</u> is flawed.

Even more than what circuit courts have done with pre-<u>Booker</u> sentences, however, the emerging jurisprudence of Remedial <u>Booker</u>'s "reasonableness" review in the circuit courts shows how that opinion necessarily is at war with Constitutional <u>Booker</u>. Two cases from the First Circuit will serve to illustrate.

In <u>United States</u> v. <u>Jiménez-Beltre</u>, 440 F.3d 514 (2006), the First Circuit sitting <u>en banc</u> set forth its instructions to district courts regarding the role the Guidelines should play in sentencing. Affirming the procedure of Judge F. Dennis Saylor, who gave the Guidelines "substantial" (but not "controlling") weight, the court held that a sentencing judge should "first calculate the guideline sentence, then determine whether departures were warranted under the guidelines, and finally determine whether a non-guideline sentence was warranted by the relevant factors set forth in 18 U.S.C. § 3553(a) (2000)." <u>Id.</u> at 516.

Further, in <u>United States</u> v. <u>Pho</u>, 433 F.3d 53 (1st Cir. 2006), the First Circuit articulated a significant limit on the acceptable justifications for a non-Guidelines sentence. In <u>Pho</u> the district court had sought to reduce the infamous 100:1 ratio

---

procedure followed by the Third, Fourth, and Sixth Circuits to be "far more consonant with precepts of justice").

between a Guidelines sentence for crack- versus powder-cocaine.[22]
Id. at 57-59.   That the defendant's sentencing took place post-
Booker enabled that court, so it thought, to fashion a more just
sentence.   It applied a 20:1 ratio instead and derived a revised
range within which the court then sentenced the defendant.   Id.
at 58, 59.

---

[22]This popular nomenclature is slightly -- but significantly
-- inaccurate.   There are three forms of cocaine relevant to the
criminal code and the Guidelines.   Title 21, Section 841 of the
U.S. Code sets forth mandatory minima which are triggered at the
100:1 ratio for crimes involving powder-cocaine and "cocaine
base", respectively.   Cocaine base has been held to mean a form
of cocaine which generally is smoked, as opposed to powder-
cocaine which generally is snorted.   See United States v. Lopez-
Gil, 965 F.2d 1124, 1129-31 (1st Cir. 1992).   The Guidelines, on
the other hand, use the term "cocaine base" synonymously with
"crack-cocaine".   See United States Sentencing Commission,
Guidelines Manual § 2D1.1(c), comment (n.(D)) (Nov. 2005).   In
reality, "crack-cocaine" is only a subset of "cocaine base" as
used in the statute.   United States v. Medina, 427 F.3d 88, 92
n.3 (1st Cir. 2005).

    The difference between crack-cocaine and other forms of
cocaine base (presumably the more pure, and less popular,
"freebase" of Richard Pryor fame) is in the chemical process used
in their creation.   The Guidelines dichotomy, unlike the
statutory distinction between powder-cocaine and cocaine base, is
not based upon chemical composition, rather only physical
characteristics.   Still, the Guidelines equate freebase-cocaine
with powder-cocaine, separating those two forms from crack-
cocaine for sentencing purposes.   See USSG App. C, amend. 487.
Thus, to speak of a dichotomy between powder- and crack-cocaine
leaves ambiguous the status of freebase-cocaine, which the
statute and the Guidelines treat differently.   The factual
distinctions among these three forms of cocaine may be of
critical import in imposing sentences.

    Judge Torruella of the First Circuit has recently authored
two opinions of admirable clarity and precision, exhibiting an
uncommon understanding of these distinctions.   United States v.
Anderson, 452 F.3d 66, 83-87 (1st Cir. 2006); United States v.
Brown, 450 F.3d 76, 79-81 (1st Cir. 2006).

19

Reviewing congressional and Commission history on the issue, the First Circuit concluded that because the ratio was a policy decision of the Congress[23], the district court had erred by "jerry-buil[ding]" its own Guidelines range. Id. at 58, 59, 64. "This approach [of the district court], which evinced a categorical, policy-based rejection of the 100:1 ratio, amounted to error as a matter of law." Id. at 62. It was "a policy judgment, pure and simple." Id. Any departure from the Guidelines is to be "based on case-specific circumstances, not on general, across-the-board policy considerations." Id. To do

---

[23]The 100:1 Guidelines ratio certainly is the policy of Congress more so than most other aspects of the Guidelines. Several years after having adopted the 100:1 ratio, the Commission attempted to reduce it to the very 20:1 ratio employed by the district Court in Pho. Congress rejected this change. It had not, however, originally mandated its ratio "root and branch" into the Guidelines; the statutory dichotomy is both different from the Commission's and more chemically astute. Title 21, Section 841 of the U.S. Code sets forth mandatory minima which are triggered by crimes involving powder-cocaine and cocaine base at the 100:1 ratio. The Guidelines, on the other hand, use the 100:1 ratio in devising which sentencing ranges correlate with certain amounts of non-crack- versus crack-cocaine. See USSG § 2D1.1(c).

If the Commission truly had followed the original congressional policy expressed in the statute, it would have followed the statutory dichotomy, as opposed to creating one of it own. As a consequence, the tortured harmonization of the statute and Guidelines is that crimes involving freebase-cocaine (statutory "cocaine base") are subject to the same statutory mandatory minima as crack-cocaine, but not to the enhanced Guideline ranges. See supra note 22.

20

otherwise would jeopardize the uniformity sought by the
Sentencing Reform Act.[24]

Even a cursory glance at the plain language of Jiménez-
Beltre and Pho indicates the continued significance of the
Guidelines in criminal sentencing. Upon closer consideration,
however, that significance proves functionally tantamount to a
determinative (and thus unconstitutional) limitation on
sentencing discretion.

With regard to the prohibition on policy-based
justifications announced in Pho, consider that the whole of the
Guidelines -- albeit through its "junior-varsity Congress", the
Sentencing Commission, Mistretta v. United States, 488 U.S. 361,
427 (1989) (Scalia, J., dissenting) -- is but one big policy
statement of Congress.[25]  The Guidelines express the relative
weight Congress gives to various factors considered at

---

[24]See also United States v. Miller, 450 F.3d 270, 273-76
(7th Cir. 2006); United States v. Duhon, 440 F.3d 711, 720 (5th
Cir. 2006); United States v. Eura, 440 F.3d 625, 632-34 (4th Cir.
2006); United States v. Lazenby, 439 F.3d 928, 933 (8th Cir.
2006) (stating that a desire for more lenient sentences generally
was "an issue for Congress, not a valid basis for exercising
discretion under Booker."; United States v. Green, 436 F.3d 449,
459 (4th Cir. 2006); United States v. Sebastian, 436 F.3d 913,
915-16 (8th Cir. 2006).

[25]Cage, 451 F.3d at 593 ("When a district court makes a
sentencing decision, it must interpret Congress's intentions in
passing sentencing laws.  The Sentencing Guidelines are an
expression of that intent . . . ."); Comment, United States v.
Pho: Reasons and Reasonableness in Post-Booker Appellate Review,
115 Yale L.J. 2183, 2191 (2006) ("[B]eneath almost every
provision lies a policy judgment deserving of some measure of
judicial respect.").

21

sentencing. If a sentencing court may not depart from a
Guidelines range for policy reasons contradictory to those
expressed therein, then the only way to ensure respect for those
policy choices is through enforcement of the Guidelines
themselves. Pho accomplishes this.

In Pho, the relevant policy expressed in the Guidelines was
that persons guilty of "crack crimes" be eligible for the same
sentences as those found guilty of mere "powder crimes", though
having possessed 100-times less cocaine. The 100:1 policy
decision, however, is no different than any other Guidelines
ratio. According to the Guidelines, it is 7 times worse if the
loss from a robbery exceeds $5 million than if it is less than
$10,000. See USSG § 2B3.1(b)(7) (providing a 7-level enhancement
for the former, but 1 level for the latter).[26]  It is twice as
serious to cause a death while operating a common carrier while
under the influence than it is if a less-than-serious injury
resulted. See USSG § 2D2.3(a) (providing a 26-level enhancement
for the former, but 13 levels for the latter). Apparently,
illegally receiving 1000 firearms is five times worse than
receiving 5. See USSG § 2K2.1(b)(1) (providing a 10-level
enhancement for the former, but 2 levels for the latter). And it
is 50 percent worse to discharge a toxic substance if you do so

_____

[26]The relative comparisons of Guidelines enhancements herein
do not equate to the same relative length of recommended
sentences. Enhancements simply adjust the base offense level.

22

continuously as opposed to just once. See USSG § 2Q1.2(b)(1)
(providing a 6-level enhancement for the former, but 4 levels for
the latter). There are also inherent policy judgments for
incongruous facts: It is worse to mail obscene matter to a minor,
see USSG § 2G3.1(b)(1)(C) (5-level enhancement), than it is to
discharge pollutants and cause disruption of public utilities,
see USSG § 2Q1.3(b)(3) (4 levels), or than it is to be a
supervisor of a criminal activity, see USSG § 3B1.1(b) (3
levels), or than it is for the abetter in an escape to be a
correctional employee, see USSG § 2P1.1(b)(4) (2 levels).
Furthermore, though certain victims may think otherwise, it is
worse to inflict permanent or life-threatening injury to someone
while assaulting them, see USSG § 2A2.2(b)(3)(C) (7-level
enhancement), than while robbing them, see USSG § 2B3.1(b)(3)(C)
(6 levels), or while kidnapping them, see USSG § 2A4.1(b)(2)(A)
(4 levels).

   None of this is to criticize the policy choices Congress,
through the Commission, has made. The point merely is that these
7:1, 2:1, 5:1, 1.5:1, 5:4:3:2, and 7:6:4 Guidelines ratios[27] are
no different than the 100:1 Guidelines ratio for crack- versus

_____

[27]To be scrupulously accurate, it must be noted that these
enhancements should be considered in relation to the base offense
levels to which they are added. Thus, there may be good reason,
in light of the underlying crime, that the same conduct warrant a
greater enhancement in certain situations than in others. Though
this observation may detract from the numerical accuracy of the
stated ratios, it does not weaken their status as policy choices.

non-crack-cocaine ruled controlling in Pho.  If a sentencing
court imposes a non-Guidelines sentence based on its own
conclusions about the relevance or relative significance of facts
deemed relevant by the Guidelines, it necessarily derogates
policy choices of Congress.

     The First Circuit did leave open the possibility of imposing
a non-Guidelines sentence "grounded in case-specific
considerations".  Pho, 433 F.3d at 65.  That court claimed it
"d[id] not intend to diminish the discretion that, after Booker,
district courts enjoy in sentencing matters . . . .  [Its] goal
[wa]s simply to channel the district courts' newfound discretion
in ways that both comport with the Booker Court's remedial
opinion and respect the separation of powers between the
legislative and judicial branches of government."  Id.  Upon
examining the hundreds of pages constituting the Guidelines,
however, there are few factors that remain case-specific; the
Guidelines have considered, accounted for, and determined
congressional policy for the relative treatment of countless
facts that otherwise might be deemed case-specific.  Many of
these Guidelines are even conveniently labeled "Policy
Statement[s]", instructing a court on how to handle factors
"ordinarily not relevant", "of a kind not adequately taken into
consideration [by the Guidelines]" (whether identified by the
Guidelines or not), or "present to a degree not adequately taken
into consideration".  USSG §§ 5H1.1-1.12, 5K2.0(a)(2)-(4).  The

24

Guidelines state that such deviations are warranted only in "exceptional" cases, USSG § 5K2.0(a)(2)-(4), and are predicted to be "highly infrequent", USSG § 1A1.1 (Part A.4.(b)) (Editorial Note).

By Pho's standards, then, the Guidelines effectively make the treatment of every conceivable fact potentially relevant to sentencing an expressed policy decision of Congress. Perhaps recognizing this, the First Circuit seemingly has stepped back from the full implications of Pho and also ruled that simply because "a factor is discouraged or forbidden under the guidelines[, that] does not automatically make it irrelevant when a court is weighing the statutory factors [18 U.S.C. § 3553(a)(1)-(7)] apart from the guidelines. The guidelines -- being advisory -- are no longer decisive as to factors any more than as to results." United States v. Smith, 445 F.3d 1, 5 (2006). The court quickly added, however, that "reliance on a discounted or excluded factor may . . . have some bearing on reasonableness." Id.; see United States v. Zapete-Garcia, 447 F.3d 57, 60 (1st Cir. 2006) ("Although this [Guidelines] policy statement is no longer binding, one of the seven factors a judge must consider in sentencing is 'any pertinent policy statement issued by the Sentencing Commission.' Therefore, while not controlling, the policy statement prohibiting reliance on arrest records must be duly considered by the district judge." (citations omitted)). Respectfully, appellate guidance

25

concerning when it is permissible for a sentencing court to

deviate from the suggested Guideline range, based on what facts,

is mind-numbingly incoherent.[28]  The First Circuit is not

necessarily to blame; Remedial Booker, though, certainly is.

　　Jiménez-Beltre, with its debate among the judges of the

First Circuit, demonstrates Remedial Booker's contradictions more

---

[28]Compare, e.g., United States v. Green, 436 F.3d 449, 459
(4th Cir. 2006) ("While [a defendant's employment record, which
is "not ordinarily relevant",] might support generally a
departure from the Sentencing Guidelines, it may be relied upon
then only if the factor is present to an exceptional degree."),
with United States v. Jackson, 408 F.3d 301, 305 n.3 (6th Cir.
2005) ("To the extent that the district court in resentencing
relies on any factors which are deemed by the Guidelines to be
prohibited or discouraged, the district court will need to
address these provisions and decide what weight, if any, to
afford them in light of Booker." (citations omitted)), and with
United States v. Hampton, 441 F.3d 284, 289 (4th Cir. 2006)
("Without deciding if a variance could be based on the existence
of a factor discouraged as a basis for departure under the
guidelines . . . .").

　　Compare also, e.g., United States v. Ossa-Gallegos, No. 05-
5824, 2006 WL 1788984 (6th Cir. June 30, 2006) (approving of a
district court's slight reduction in the defendant's sentence due
to disparity with similarly situated defendants in so-called
"fast track" districts), with United States v. Martinez-Flores,
428 F.3d 22, 29 n.3 (1st Cir. 2005) ("It is arguable that even
post-Booker, it would never be reasonable to depart downward
based on disparities between fast-track and non-fast-track
jurisdictions given Congress' clear (if implied) statement in the
PROTECT Act provision that such disparities are acceptable.").

　　Compare also, e.g., United States v. Boscarino, 437 F.3d
634, 638 (7th Cir. 2006) ("[T]he kind of 'disparity' with which §
3553(a)(6) is concerned is an unjustified difference across
judges (or districts) rather than among defendants to a single
case."), with Thurston, 2006 WL 2065404, at *4 ("[O]ne possible
problem with the [district] court's rationale was the emphasis on
disparities between codefendants without giving significant
consideration to encouraging nationwide uniformity in sentencing
-- the primary focus of § 3553(a)(6)."), and with United States
v. Lazenby, 439 F.3d 928, 933 (8th Cir. 2006) (reversing sentence
due to disparate sentence of co-defendant).

26

clearly still. In ruling that the Guidelines are to receive "substantial" weight, the majority of the First Circuit stated that its "conclusion [wa]s rooted in both parts of the Booker decision". Jiménez-Beltre, 440 F.3d at 518. The court first rejected the government's argument that a sentence within the Guidelines was per se reasonable, id. at 517, before then declaring that "the guidelines continue in our view to be an important consideration in sentencing . . . ", id. at 518. The court acknowledged that even though "making the guidelines 'presumptive' or 'per se reasonable' does not make them mandatory, it tends in that direction". Id. Still, the Guidelines "cannot be called just 'another factor' in the statutory list, 18 U.S.C. 3553(a) (2000), because they are the only integration of the multiple factors". Id. The fact that the Guidelines are promulgated by an "expert" agency and that they were important to promoting remedial Booker's "uniformity and fairness" concerns counseled in favor of their continued central role. Id.

Judge Howard concurred in the result, but would have held within-Guidelines sentences per se reasonable. See id. at 523 ("[T]here is a range of 'reasonable' sentences which always will include within it the guidelines sentencing range . . . ."). This, he reasoned, was because "'[r]easonableness' within the meaning of Booker . . . is 'reasonableness in light of Congress's purposes in enacting the Sentencing Reform Act of 1984.'" Id. at

27

521-22. "The guidelines therefore are not only central to the uniformity that Congress sought to bring about in passing the Act; they also are the data-driven and experienced-based manifestations of Congress's considered views on how, in the usual case, to accomplish the purposes of federal sentencing." Id. at 522. Judge Howard observed that "the primary theme of Justice Breyer's remedial opinion is that Congress's purposes were and are valid, and that federal judges should strive to apply the Act (and the regime created by the Act, almost all of which was left intact) to further those purposes." Id. "[T]he guidelines . . . are the only conceivable centers of gravity around which some semblance of uniformity in federal sentencing might be maintained . . . ." Id. at 522-23.

Judge Lipez, on the other hand, dissented and would have ruled that the Guidelines are merely an important first step. Beyond that, however, "[t]here is scant difference between treating a guidelines sentence as presumptively controlling and stating that the court will depart from that sentence only for 'clearly identified and persuasive reasons.'" Id. at 524 (quoting Judge Saylor at the sentencing hearing). By organizing sentencing decisions around the Guidelines and only focusing on the question of whether a non-Guidelines sentence is reasonable, courts "will effectively give the guidelines a controlling weight and a presumptive validity that is difficult to defend under the constitutional ruling in Booker." Id. at 528. Having the

28

sentencing court start the process by calculating the Guidelines

is "sensible" because "[t]he guidelines are the only sentencing

factor that yield a measure of time. That fact alone establishes

their continuing importance. . . . With [the Guidelines'] focus

on the bottom line, the prosecution and defense counsel will

inevitably address their arguments to the appropriateness or

inappropriateness of a guidelines sentence." Id. at 525. Such a

method would "steer a sensible course between" the two Booker

opinions. Id. at 525.

This display by the First Circuit shows the judges of that

court grappling with the inconsistency of Booker. Every judge

was attempting faithfully to implement the mandates of that

decision, yet doing so proved difficult in the face of its

incoherence. When forced to reconcile the inconsistency, Judge

Lipez placed more weight on Constitutional Booker[29], Judge Howard

on Remedial Booker[30], and the majority somewhere in between.

Is this but a manufactured debate? Indeed, the only clear

mandate from the Supreme Court going forward is that sentencing

---

[29]See Jiménez-Beltre, 440 F.3d at 528 n.11 (Lipez, J.,
dissenting) ("Many commentators argue that by giving the
guidelines controlling weight, and abdicating the responsibility
to take account of the other section 3553(a) factors, courts
effectively make the guidelines as binding as they were before
Booker, thereby violating Booker's constitutional command."
(internal quotation marks and alteration omitted)).

[30]See Jiménez-Beltre, 440 F.3d at 522 (Howard, J.,
concurring) (noting that the "primary theme of Justice Breyer's
remedial opinion" was that the Act -- and, therefore, the
Guidelines -- should be given effect).

courts "consult [the] Guidelines and take them into account when
sentencing." Booker, 543 U.S. at 264. From this language, why
the Guidelines should receive any special emphasis over the other
factors in Section 3553(a) is quite unclear. See D'Addio, supra,
at 175-78 ("Booker imposes no legal obligation on judges to place
any particular weight on the Sentencing Guidelines."). This fact
certainly was not lost on anyone: Both Judges Howard and Lipez
acknowledged that nothing in Booker required his particular
interpretation.[31] If all that a sentencing judge must do,

---

[31]See Jiménez-Beltre, 440 F.3d at 521 (Howard, J.,
concurring) ("Certainly I cannot say that these positions are
required by the language of Booker (nor, however, are they
inconsistent with that language)."); id. at 528 n.11 (Lipez, J.,
dissenting) (quoting Justice Scalia's dissent to Remedial Booker
"stating that 'logic compels the conclusion that the sentencing
judge, after considering the recited factors (including the
Guidelines), has full discretion, as full as what he possessed
before the Act was passed, to sentence anywhere within the
statutory range. If the majority thought otherwise . . . its
opinion would surely say so.'" (citing Booker, 543 U.S. at 305)
(alteration in original)).

See also Booker, 543 U.S. at 300 (Stevens, J., dissenting in
part) ("True, judges must still consider the sentencing range
contained in the Guidelines, but that range is now nothing more
than a suggestion that may or may not be persuasive to a judge
. . . ."); id. at 306 n.4 (Scalia, J., dissenting in part) ("The
closest the remedial majority dares come to an assertion that the
Guidelines must be followed is the carefully crafted statement
that '[t]he district courts, while not bound to apply the
Guidelines, must consult those Guidelines and take them into
account when sentencing.' The remedial majority also notes that
the Guidelines represent what the Sentencing Commission 'finds to
be better sentencing practices.' True enough, but the
Commission's view of what is 'better' is no longer authoritative,
and district judges are free to disagree -- as are appellate
judges." (citations omitted, alteration in original)).